IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROBERT E. CALLOWAY, JR., | * | |
|    Plaintiff, | * | |
| v. | * | CIVIL ACTION NO. GLR-20-1953 |
| DR. MOHAMED MOUBAREK, | * | |
|    Defendant. | * | |

***

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Mohamed Moubarek, M.D.'s Response to Order to Show Cause and Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 6). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant Moubarek's Motion, construed as one for summary judgment.

### I.   BACKGROUND

**A.   Plaintiff's Allegations**

Plaintiff Robert E. Calloway, Jr. is a federal inmate presently housed at the Federal Correctional Institution in Cumberland, Maryland ("FCI-Cumberland"). (Compl. at 2, ECF No. 1). He alleges that he suffers from kidney disease and that Defendant Mohamed Moubarek, M.D., has refused to send him to a specialist or provide necessary medical treatment in violation of his Eighth Amendment rights. (Id. at 5). He seeks injunctive relief "compelling Moubarek to provide [him] with constitutionally adequate medical care for [his] chronic kidney disease by ensuring that [he is] treated by a specialist able to treat

kidney disease and related 'high critical' medical concerns regarding [his] 'creatinine' level." (Id. at 6).

On June 22, 2020, Calloway sent an email to the Director of Health Services, which he characterized as an initial administrative grievance, stating that he needed immediate treatment for his kidney disease and asking to see a specialist. (Pl.'s Exhs. at 10, ECF No. 8-1). On July 28, 2020, he sent a second email to Health Services inquiring about the status of his grievance. (Id. at 9). Calloway states that he intends to pursue his grievance throughout each stage of the Administrative Remedy Program ("ARP"). (Calloway Decl. at 7, ECF No. 8).

**B.     Defendant's Response**

   **1.  Medical Care**

Calloway suffers from Chronic Kidney Disease ("CKD"), which Defendant Mohamed Moubarek M.D., Clinical Director of FCI-Cumberland, describes as a progressive disease. (Moubarek Decl. ¶¶ 1, 4, ECF No. 6-2). CKD is categorized into five stages that correspond to the severity of the disease. (Id. ¶ 5). The disease is managed by controlling its signs and symptoms, reducing complications, and slowing its progression. (Id. ¶ 4). Management includes monitoring and controlling vital signs and blood work and treating the underlying conditions, such as high blood pressure and diabetes mellitus. (Id.).

Moubarek explains that in healthy patients, kidneys maintain creatinine in a normal range. (Id. ¶ 6). When the kidneys are impaired, the creatinine level in the blood rises because the kidneys have poor clearance. (Id.). High levels of creatinine in the blood is a warning of possible kidney malfunction or failure. (Id.). Kidney function is more precisely

measured by calculating how much creatinine is cleared from the body by the kidneys, a calculation referred to as creatinine clearance. (Id.). Creatinine clearance estimates the rate of filtration by kidneys, a rate referred to as the glomerular filtration rate ("GFR"). (Id.).

Moubarek further explains that GFR is the best measure of kidney function and the GFR number is used to determine a person's stage of CKD: Stage One has a GFR greater than ninety milliliters per minute; Stage Two (Mild CKD) has a GFR of sixty to eighty-nine milliliters per minute; Stage Three (Moderate CKD) has a GFR of thirty to fifty-nine milliliters per minute; Stage Four (Severe CKD) has a GFR of fifteen to twenty-nine milliliters per minute; and Stage Five (End-Stage CKD) has a GFR less than fifteen milliliters per minute. (Id. ¶ 6). A GFR under sixty milliliters per minute is abnormal for adults. (Id. ¶ 6). When a patient's GFR is less than thirty milliliters per minute, i.e., in the case of Severe CKD, a referral to a nephrologist is indicated. (Id.).

On May 28, 2019, Calloway entered the Bureau of Prisons ("BOP") and was assigned to FCI-Cumberland. (Id. ¶ 8). Laboratory tests taken on June 18, 2019, showed he had possible CKD as his GFR was forty-four milliliters per minute. (Id. at 7).[1]

On July 2, 2019, Calloway was evaluated by Kristi Crites, C.R.N.P., who diagnosed Calloway with diabetes, CKD, hyperlipidemia, and hypertension. (Id. ¶ 10; pp. 14–17). He was prescribed medications to control his hypertension and hyperlipidemia and placed in chronic care clinics so that he would be seen by medical providers at least every six months.

---

[1] Calloway states that he had blood work on May 11, 2018 by the State of Ohio and on September 11, 2018, when he entered a BOP holding facility, neither of which showed signs of CKD. (Calloway Decl. at 6).

3

(Id. ¶ 10). He was advised he could also make appointments as needed through the sick call process. (Id.). Crites ordered laboratory work and an ultrasound of Calloway's kidneys. (Id. at 16). The laboratory tests showed a GFR of thirty-eight milliliters per minute. (Id. at 9).

On August 9, 2019 and November 22, 2019, imaging of Calloway's kidneys showed he was missing his right kidney and had a small left kidney, suggesting that he had CKD for many years prior to entering the BOP. (Id. ¶ 9; pp. 11–12).[2]

Calloway had additional lab work performed on November 25, 2019, February 25, 2020, May 12, 2020, June 11, 2020, and June 24, 2020. (Id. ¶ 11; pp. 19–23). On each occasion, his GFR was above thirty milliliters per minute, meaning that his CKD remained moderate. (Id.).

Following a clinical encounter with Calloway on November 26, 2019, Crites noted that he should be sent to a nephrologist due to elevated creatinine and a GFR of thirty-four milliliters per minute. (Id. ¶ 12; p. 25). While waiting for the appointment, however, his kidney function improved and his blood pressure came under control. (Id. ¶ 12). As a result, the appointment was cancelled. (Id.).

Moubarek met with Calloway on June 18, 2020. (Id. at 29). Moubarek noted that Calloway suffers from: asymptomatic Type II diabetes; hypertension and hyperlipidemia, which were being treated pharmacologically; and Stage Three CKD, with a GFR of forty-

---

[2] Calloway notes that in early 2011 he was to be a kidney donor for his mother, but he was unable to complete the process due to his incarceration, and states his belief that he had two functioning kidneys at that time. (Calloway Decl. at 3).

4

seven milliliters per minute. (Id. ¶ 13; p. 29). Moubarek counseled Calloway regarding compliance with his prescribed medications and added a prescription of Lisinopril for kidney protection and to treat Calloway's high blood pressure. (Id. ¶ 13; p. 31).[3]

FCI-Cumberland is a Medical Care Level Two institution that, according to Moubarek, is appropriate for Calloway's current stage of CKD. (Id. ¶ 14). Inmates are designated to a Medical Care Level Three institution if they have CKD with a GFR less than thirty milliliters per minute, but do not yet require dialysis. (Id. ¶ 14; p. 35). Moubarek avers that if Calloway's condition worsens, he will be scheduled to see a nephrologist and/or moved to a higher medical care institution. (Id. ¶ 14).

**2. Administrative Filings**

As of July 16, 2020, Calloway had filed two administrative grievances during his incarceration in the BOP. (Williams Decl. ¶ 5, ECF No. 6-3). Neither grievance concerned the care of his CKD or a request to be transferred to a higher medical care institution. (Id.). On November 18, 2019, Calloway filed a grievance regarding denial of access to his medical records, including ultrasound results. (Id. at 5).[4] On July 2, 2020, he filed a grievance about being moved to another cell. (Id.).

---

[3] Calloway contends that this medication should not have been prescribed to him since he suffers from CKD. (Calloway Decl. at 4).

[4] Calloway has provided a copy of the Warden's response, dated December 16, 2019, which makes plain that this grievance, assigned ARP No. 997342-F1, solely concerned Calloway's complaint that he had been denied access to his medical records. (Pl.'s Exhs. at 7).

5

## C.     Procedural History

On June 30, 2020, Calloway filed this Complaint against Defendant Mohamed Moubarek, M.D., alleging that he has been denied adequate medical care to treat his CKD and seeking injunctive relief mandating he be provided "constitutionally adequate medical care" and "ensuring that [he is] treated by a specialist able to treat kidney disease." (Compl. at 6).[5]

On July 23, 2020, Moubarek filed a Response to Order to Show Cause and Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. (ECF No. 6). Calloway filed an Opposition on August 17, 2020, in the form of a declaration. (ECF No. 8).[6]

## II.     DISCUSSION

### A.     Non-Dispositive Motions

On August 17, 2020, the Clerk docketed correspondence from Calloway as a "Supplement to Complaint." (ECF No. 9). The document appears to be a written inquiry from Calloway regarding how to receive counsel in this case and how to file an affidavit

---

[5] The Court will grant the accompanying Motion for Leave to Proceed in Forma Pauperis (ECF No. 2).

[6] In his Opposition, Calloway contends that his substantive due process rights have been violated. (Calloway Decl. at 3, 7). Calloway further alleges that Moubarek failed to "properly train and supervise medical staff" and the conduct of Moubarek constitutes "gross negligence and intentional infliction of emotional distress." (Id. at 4). Briefs in opposition to a dispositive motion may not be used to amend a complaint or add new claims. See Zachair Ltd. v. Driggs, 965 F.Supp. 741, 748 n.4 (D.Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), aff'd, 141 F.3d 1162 (4th Cir. 1998); Mylan Laboratories, Inc. v. Akzo, N.V.,770 F.Supp. 1053, 1068 (D.Md. 1991), aff'd, 2 F.3d 56 (4th Cir. 1993). As such, the Court will not consider the new allegations raised in Calloway's Opposition.

of indigency. To the extent the letter may be construed as Motion to Appoint Counsel, the Motion is denied. A pro se prisoner does not have a general right to counsel in a § 1983 action." Evans v. Kuplinski, 713 F.App'x 167, 170 (4th Cir. 2017). A federal district court judge's power to appoint counsel under 28 U.S.C.§ 1915(e)(1) is discretionary, and an indigent claimant must present "exceptional circumstances." Id. at 170; Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987). Exceptional circumstances exist where a "pro se litigant has a colorable claim but lacks the capacity to present it." See Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984), abrogated on other grounds by Mallard v. U.S. Dist. Ct., 490 U.S. 296, 298 (1989) (holding that 28 U.S.C. § 1915 does not authorize compulsory appointment of counsel). Calloway has articulated the legal and factual basis of his claims, the issues before the Court are not complicated, and, as discussed below, the case will be dismissed. There are no exceptional circumstances that would warrant the appointment of counsel under § 1915(e)(1).

**B.     Conversion**

Moubarek styled his Motion as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the

7

pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" Wells-Bey v. Kopp, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). The Court "does not have an obligation to notify parties of the obvious." Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise satisfactorily the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified

8

reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d). A Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 954 (4th Cir. 1995)).

The Fourth Circuit has warned that it "'place[s] great weight on the Rule 56[d] affidavit' and that 'a reference to Rule 56[d] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56[d] affidavit.'" Harrods, 302 F.3d at 244 (quoting Evans, 80 F.3d at 961). Failing to file a Rule 56(d) affidavit "is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Id. (quoting Evans, 80 F.3d at 961). Nevertheless, the Fourth Circuit has indicated that there are some limited instances in which summary judgment may be premature notwithstanding the non-movants' failure to file a Rule 56(d) affidavit. See id. A court may excuse the failure to file a Rule 56(d) affidavit when "fact-intensive issues, such as intent, are involved" and the nonmovant's objections to deciding summary judgment without discovery "serve[ ] as the functional equivalent of an affidavit." Id. at 245 (quoting First Chi. Int'l v. United Exch. Co., 836 F.2d 1375, 1380–81 (D.C.Cir. 1988)).

Here, the Court concludes that both requirements for conversion are satisfied. Calloway was on notice that the Court might resolve Moubarek's Motions under Rule 56 because Moubarek styled his Motion in the alternative for summary judgment and presented extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. In addition, the Clerk informed Calloway about the Motion and the need to file an opposition. (See Rule 12/56 Letter, ECF No. 7). Calloway filed an Opposition but did not include a request for more time to conduct discovery. Because the Court will consider documents outside of Calloway's Complaint in resolving Moubarek's Motion, the Court will treat the Motion as one for summary judgment.

**C.      Standard of Review**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be

10

made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**D.** **Analysis**

    **1.** **Exhaustion**

Moubarek raises the affirmative defense that Calloway has failed to exhaust his administrative remedies. If Calloway's claims have not been properly presented through the administrative remedy procedure, they must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e. The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. §1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. §1997e(h); see also Gibbs v. Bureau of Prisons, 986 F.Supp. 941, 943–44 (D.Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see Chase v. Peay, 286 F.Supp.2d 523, 528 (D.Md. 2003), aff'd, 98 F.App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. See Jones v. Bock, 549 U.S. 199, 215–16 (2007); Anderson v. XYZ Corr. Health Services, Inc., 407 F.2d 674, 682 (4th Cir. 2005).

A claim that has not been exhausted may not be considered by this court. See Bock, 549 U.S. at 220. In other words, exhaustion is mandatory. Ross v. Blake, 136 S.Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. Ross, 136 S.Ct. at 1856 (citing Miller v. French, 530 U.S. 327, 337 (2000)).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. Moore v. Bennette, 517 F.3d 717, 725, 729 (4th Cir. 2008); see also Langford v. Couch, 50 F.Supp.2d 544, 548 (E.D.Va. 1999) ("The second PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Woodford, 548 U.S. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)).

The BOP established the ARP for inmates to resolve concerns related to their confinement. See 28 C.F.R. § 542.10 et seq. Inmates must first attempt informal resolution with staff. Id. § 542.13. If an inmate is unable to resolve his complaint informally, he may

13

file a formal written complaint using the appropriate form within twenty calendar days of the date of the occurrence on which the complaint is based. Id. § 542.14(a). If an inmate is not satisfied with the Warden's response to the formal complaint, he may appeal, using the appropriate form, to the Regional Director within twenty calendar days of the Warden's response. Id. § 542.15(a). If the inmate is still dissatisfied, he may appeal the Regional Director's response to the Office of the General Counsel, located in the BOP Central Office in Washington, D.C., using the appropriate form. The inmate must file this final appeal within thirty calendar days of the date the Regional Director signed the response. Id. An inmate is not deemed to have exhausted his administrative remedies until he has pursued his grievance through all levels. See Woodford, 548 U.S. at 90; see also Gibbs, 986 F.Supp. at 943–44 (dismissing a federal prisoner's lawsuit for failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process).

Exhausting administrative remedies after a complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies. See Neal v. Goord, 267 F.3d 116, 121–22 (2d Cir. 2001), overruled on other grounds by Porter v. Nussle, 534 U.S. 516 (2002). In Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999), the U.S. Court of Appeals for the Sixth Circuit stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court. . . . The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." See also Kitchen v. Ickes, 116 F.Supp.3d 613, 625–26 (D.Md. 2015) (refusing to allow claim to move forward premised on allegations contained in an ARP filed after plaintiff filed his complaint in federal court), aff'd, 644 F. App'x 243 (4th Cir. 2016).

Calloway does not dispute that he failed to exhaust his administrative remedies before bringing this case. Calloway filed his initial informal grievance on June 22, 2020, eight days before this case was docketed. It does not appear that he ever initiated the formal grievance process, as he has provided no evidence that he submitted a formal grievance using the appropriate forms. While he indicates his intention to complete the administrative process, there is no evidence that he did so prior to filing the instant Complaint. Indeed, given the timing of the filing of his ARPs and this Complaint, doing so would likely have been impossible. Accordingly, the Complaint must be dismissed without prejudice for failure to exhaust administrative remedies.

### 2. Injunctive Relief/Deliberate Indifference

In his request for relief, Calloway suggests that without an injunction he will suffer irreparable harm. A preliminary injunction is an extraordinary and drastic remedy. See Munaf v. Geren, 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) that the injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." Direx Israel, Ltd. v. Breakthrough Med. Group, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional

institutions only under exceptional and compelling circumstances. See Taylor v. Freeman, 34 F.3d 266, 269 (4th Cir. 1994).

The record evidence, viewed in the light most favorable to Calloway, does not establish a likelihood of success on a claim that his Eighth Amendment rights were violated due to denied or delayed medical treatment. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976); see also Hope v. Pelzer, 536 U.S. 730, 737 (2002); Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016); King v. Rubenstein, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)); accord Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017).

To prevail on an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Anderson, 877 F.3d at 543. A prisoner plaintiff must allege and provide some evidence he was suffering from a serious medical need and that defendants were aware of his need for medical attention but failed to either provide it or ensure it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v. U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King, 825 F.3d at 218; Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must

16

be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); accord Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendant was subjectively reckless in treating or failing to treat the serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendant knew about the problem. Scinto, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to a constitutional level. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986) (citing Estelle, 429 at 106); see also Scinto, 841 F.3d at 225. "Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" (quoting Farmer, 511 U.S. at 835) (alteration in original)); Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3rd

Cir. 1970)) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim[.]")

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977)).

The undisputed evidence before the Court establishes that Calloway is receiving regular care for his CKD, including routine laboratory work, diagnostic testing, and management of other health conditions that negatively impact his CKD. Calloway's CKD has remained stable and referral to a nephrologist or transfer to a higher-level medical care facility is not warranted at this time. In all, there is no evidence that Moubarek has been deliberately indifferent to Calloway's serious medical need. Calloway's claim for injunctive relief fails because he is unlikely to be successful on the merits, both because he has not established an Eighth Amendment claim and because he has not exhausted his

18

available administrative remedies. Further, Calloway has failed to demonstrate a likelihood of irreparable harm. Accordingly, Calloway's request for injunctive relief will be denied.

### III. CONCLUSION

For the foregoing reasons, the Court will grant Moubarek's Motion to Dismiss, or in the Alternative, for Summary Judgment (ECF No. 6) and deny Calloway's request for injunctive relief. A separate Order follows.

Entered this 30th day of November, 2020.

                                                        /s/                 .
                                      George L. Russell, III
                                      United States District Judge